# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| Andrea CASSELL, and | ) | |
| Rafik BOUGHADOU, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 12-cv-9786 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| Janet NAPOLITANO, Secretary of Homeland | ) | |
| Security; Alejandro MAYORKAS, Director, | ) | |
| U.S. Citizenship and Immigration Services | ) | |
| ("USCIS"); Lori PIETROPAOLI, District | ) | |
| Director, USCIS Chicago District; and Eric H. | ) | |
| Holder, Jr., Attorney General of the United States, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Andrea Cassell and Rafik Boughadou married on August 18, 2004. About six weeks later, Cassell filed a Form I-130, Petition for Alien Relative, on behalf of Boughadou, a citizen and national of Algeria, with the United States Citizenship and Immigration Services ("USCIS"). USCIS denied Cassell's petition on May 2, 2011, and the Board of Immigration Appeals ("BIA"), after a *de novo* review, affirmed USCIS's decision and dismissed the appeal on November 2, 2012. On December 7, 2012, Plaintiffs commenced this lawsuit, challenging the denial of Cassell's petition by the BIA and USCIS and seeking injunctive and declaratory relief under the Administrative Procedures Act, 5 U.S.C. §§ 702-706.

Before the Court are Defendants' motion for summary judgment [17] and Plaintiffs' cross-motion for summary judgment [22]. Plaintiffs argue that the decisions of the BIA and USCIS were arbitrary and capricious, in violation of 5 U.S.C. § 706, and therefore should be vacated and reversed. Defendants argue that the challenged decisions should be upheld as

reasonable and supported by substantial evidence. For the reasons stated below, the Court grants Defendants' motion for summary judgment [17] and denies Plaintiffs' cross-motion for summary judgment [22].

## I.    Background

Andrea Cassell and Rafik Boughadou met waiting in line at a McDonald's in downtown Chicago in June 2004. ROP 192. After talking for two hours, they exchanged phone numbers and got married two months later on August 18, 2004 in a civil ceremony held before a judge in the Circuit Court of Cook County, Illinois. *Id.* Cassell is a United States citizen, (ROP 548), who, at the time, lived in Berwyn, Illinois with her mother, Nora Cassell, and her first-grade daughter. ROP 193. Boughadou is an Algerian national and citizen, who lawfully came to the United States as a visitor before changing his status to that of an international business student. ROP 192, 556-61. When Boughadou met Cassell, he had been living in a tiny studio apartment located at 444 West St. James Street, #811 Chicago, Illinois ("the St. James apartment") that he had been renting since February 2000 for $585/month. ROP 332. On June 11, 2004, Boughadou signed a new, one-year lease with a start date of October 1, 2004 and an end date of September 30, 2005, although the end date subsequently was amended to April 30, 2005. ROP 205-06, 259.

On September 30, 2004, Cassell filed a Form I-130, Petition for Alien Relative, with USCIS, seeking to classify Boughadou as an immediate relative based on their marriage, and Boughadou filed a Form I-485, Application for Permanent Residence or Adjust Status, based on his marriage to Cassell. ROP 325-30. Cassell completed a Form G325A in conjunction with the I-130 Petition, on which she stated that she began living at the St. James apartment in August 2004. ROP 333. On December 15, 2004, Cassell and Boughadou were notified that they would be interviewed regarding Cassell's petition on April 20, 2005. ROP 35, 37. At or before their

interview, the couple submitted a number of documents to USCIS in support of Cassell's

petition, including:

- a lease, signed by both Cassell and Bougadou that designated them as tenants of the St. James apartment, beginning September 8, 2004 and ending April 30, 2005 (ROP 37)

- statements from Cassell and Boughadou's joint TCF bank account, opened on February 8, 2005, and copies of four checks from the account that were signed and cashed by Boughadou (ROP 37)

- an undated life insurance "illustration," issued by Boughadou's friend, Stephanie Weidner, an American Express financial advisor (ROP 37)

- Automobile insurance policy information in the name of Boughadou, addressed to both Cassell and Boughadou at the St. James apartment (ROP 128)

- Boughadou and Cassell's "married filed jointly" 2004 income tax return, which also demonstrated that Boughadou's underlying W-2 listed Boughadou's address as the St. James apartment, while Cassell's W-2s listed two separate Berwyn, Illinois addresses (ROP 37)

- a receipt letter from the Social Security Administration, demonstrating that Cassell applied for a new social security card, dated September 8, 2004, that listed Cassell's address as Berwyn, Illinois (ROP 37, 190)

- a marriage certificate, dated August 18, 2004 (ROP 128)

- copies of three electric bills, addressed to both Boughadou and Cassell at the St. James apartment, but for accounts listed only in Boughadou's name, dated January 5, February 9, and March 9, 2005 (ROP 128)

- two phone bills addressed to both Cassell and Boughadou (ROP 128

- photographs of the couple and Cassell's daughter, developed two days before the first interview (ROP 190)

- four greetings cards: a Christmas card from Stephanie Weidner to the couple, a November 10, 2004 birthday card from Cassell to Boughadou, an undated card from Boughadou to Cassell that read "Andrea, I just wanted to say I love you," and a Christmas Card from Cassell to Rafik addressed "to my husband" (ROP 129)

During the first interview, Cassell stated that she did not have a home phone, which

contradicted the phone bills that she submitted. ROP 190. And the documents she provided that

listed her Berwyn address did not square with the lease for the St. James apartment that listed her as a tenant. *Id.* Outside of the joint bank account, the interviewer found no evidence of co-mingled finances or shared financial responsibility. *Id.* Because the first interviewer suspected that the couple's marriage may not be bona fide, he referred the petition for further review by USCIS. ROP 190. A subsequent investigation uncovered additional documentation that suggested that Cassell did not reside at the St. James apartment with Boughadou. Namely, USCIS obtained arrest records from the Chicago Police department that listed a Berwyn, Illinois address for Cassell when she was arrested on September 8, 2004. ROP 39. Police records also indicated that on January 7, 2005, Cassell filed a complaint against her daughter's father, Albert Sanchez, which also listed a Berwyn, Illinois address. ROP 66. Cassell was arrested again on February 11, 2005 by the Chicago Police Department, this time for endangering the life and health of a child, and the arrest records again listed a Berwyn, Illinois address for Cassell. Finally, USCIS contacted the landlord at the St. James apartment, who informed USCIS that Cassell was not technically listed as a tenant of the unit because, although she signed the lease on September 8, 2004, she refused the prerequisite credit check, which invalidated the lease she had signed. ROP 37, 118, 129. The investigation also uncovered that Boughadou purchased a condo on South State Street ("the South State Street condo") on April 19, 2005, the day before the first interview. ROP 190. Based on these discoveries, USCIS scheduled the couple for a second interview. *Id.*

On August 6, 2009, a second USCIS officer interviewed Cassell. At the second interview, Cassell revealed that she and Boughadou separated in either late April or early May 2005, a few weeks after their first interview, and had not lived together since. ROP 323, 331. She also disclosed that since the first interview she had given birth to two children (in 2007 and

2009), fathered by a man named Jonathan Gonzalez, with whom Cassell was then living. ROP 38. Finally, Cassell told USCIS that she did not move in with Boughadou for two or three months after they were married, a statement that contradicted the G-325A application that she completed on August 24, 2004, where she stated that she began living with Boughadou at the St. James apartment in August 2004. ROP 38, 333. At or prior to this interview, Cassell also provided the following additional documents to USCIS:

- cell phone bills addressed to "Rafik Boughadou, Attn: Andrea M. Boughadou," dated between February 22, 2007 and January 22, 2009 (ROP 129)

- letters from Ameriprise Financial addressed to Cassell and Beneficiary, dated July 31, 2008 and March 27, 2009 (ROP 129)

- bank account statements from the joint TCF account through June 11, 2009 (ROP 128)

According to Cassell, at the conclusion of the interview, USCIS officer Byron Allen refused to interview Boughadou, accused her of having a fraudulent marriage, encouraged her to withdraw her I-130 petition, and notified her of his intent to deny the petition regardless of any additional evidence she might submit. ROP 195.

On October 19, 2009, USCIS issued a Notice of Intent to Deny Petition for Alien Relative ("the NOID"), in which USCIS outlined its various reasons for doubting the validity of Cassell and Bougadou's marriage. ROP 323. More specifically, the NOID highlighted the invalidity of the couple's St. James apartment lease, their failure to give a legitimate reason for living apart before separating, Boughadou's home purchase prior to their first interview, their lack of joint assets and shared financial responsibilities, and the birth of Cassell's two children, whom she had with another man during her marriage to Boughadou. *Id.* Based on the evidence at the time, USCIS declared its belief that Cassell and Boughadou had entered into a sham marriage for the purpose of evading the immigration laws of the United States. *Id.* The NOID

afforded Cassell the opportunity to submit countervailing evidence in support of her petition and opposition to the proposed denial within thirty days of the letter. ROP 324.

Cassell submitted a twelve-page response to the NOID on November 17, 2009, attaching eighteen additional pieces of evidence, requesting that her petition be assigned to a new USCIS officer, and arguing (1) that the totality of the evidence that she submitted satisfied her burden of demonstrating her and Boughadou's intent to establish a joint life together at the inception of their marriage by a preponderance of the evidence and (2) that USCIS did not have substantial and probative evidence that her marriage to Boughadou was a sham. ROP 180, 184. Among the documents attached to Cassell's submission were affidavits by her, her mother, Boughadou, Boughadou's mother, Boughadou's father, and several friends, each of whom declared that, in their opinion, Cassell and Boughadou married out of love and not for the purpose of evading immigration laws. ROP 179. In Cassell's affidavit, she explained that she never moved in with Boughadou full-time prior to their separation because she had fought for a long time to get "special services" for her daughter, such as ADHD therapy, at her daughter's school in Berwyn. ROP 193. Rather than move in with Boughadou, Cassell explained, she continued to live with her mother and daughter in Berwyn, but was able to stay with Boughadou on the weekends when her daughter's father (Albert Sanchez) had court-ordered supervision. ROP 193.

In addition to the affidavits, Cassell submitted an automobile insurance policy listing both she and Boughadou as insureds, additional lease documentation obtained from a management agent at the St. James apartment building, a settlement statement listing April 29, 2005 as the closing date for Boughadou's South State Street condo, documents relating to Cassell's daughter's learning disability from 2008 (including that she made "slow academic progress since first grade"), and documents concerning Cassell's petition for an emergency

protective order against Albert Sanchez in 2003 and her criminal complaint against him in January 2005. ROP 178-180. The submission noted that Cassell was "unable to comment on the . . . allegation that [she] was not allowed to sign the first lease due to an alleged credit check, since [she] ha[d] no information about this." ROP 179.

On July 19, 2010, USCIS issued an Amended Notice of Intent to Deny Petition for Alien Relative ("the amended NOID"), in consideration of Cassell's submission. The amended NOID noted that some of the newly-submitted documents "tend to overcome some of the flaws in the evidence cited by the earlier NOID." ROP 132. Specifically, Cassell submitted an automobile insurance policy that demonstrated that she was added as an insured in late December 2004. ROP 132. (The previous policy she had submitted listed only Boughadou as an insured.) ROP 132. Additionally, Cassell's submission demonstrated that she and Boughadou had purchased life insurance a few days before their first interview with USCIS. ROP 132. (Previously, Cassell only had submitted a life insurance "illustration," that reflected a menu of potential premiums and payouts that the couple could purchase.) The amended NOID noted that the affidavits provided with Cassell's submission "constitute positive, but not overwhelming, corroborative evidence for the bona fides of [her] marriage." ROP 133. In the end, however, the amended NOID reflected USCIS's conclusion that Cassell's response to the NOID was not enough to overcome the "significant inconsistencies in the record which affect the credibility of the statements and evidence [she had] presented." ROP 127. The amended NOID noted that Cassell "presented some positive evidence for the bona fide nature of [her] marriage," but that she had still "not met her burden of proving the bona fides by the preponderance of the evidence." ROP 133. Again, USCIS invited Cassell to submit new evidence and a written

response within thirty days. ROP 134. USCIS also approved Cassell's request to have her case re-assigned to a new officer. ROP 126.

On August 18, 2010, Cassell responded to the amended NOID with another twelve-page submission and three more affidavits (from Cassell, her mother, and Boughadou), again arguing that she had met her burden of establishing a bona fide marriage by a preponderance of the evidence, and attempting to clarify some of USCIS's "basic misunderstandings" of the evidence. ROP 113. Cassell explained, as she did in her previous affidavit, that she and Boughadou had been in a fight just prior to their first USCIS interview on April 20, 2005, which she hoped would explain their unfavorable "demeanor" at that interview. ROP 116. She further explained that her daughter's learning disability prevented her from moving in with Boughadou full-time, and that fear of Cassell's ex-boyfriend Albert Sanchez was an impediment to Boughadou moving to Berwyn. ROP 116. Additionally, Cassell explained that the joint TCF Bank account that she and Boughadou opened in February 2005 (six months after their civil marriage and two months after they received notice of their April 2005 interview) was due to their previous inability to open a joint checking account at other banks due to her poor credit. ROP 117. Boughadou explained in his affidavit that it wasn't until "a friend told [him] that TCF Bank would open an account without regard to someone's poor banking history" were they able to locate a bank where they could co-mingle their finances. ROP 198. Cassell argued that she never intended to deceive USCIS by providing an "invalid" lease; she signed a lease on September 8, 2004 with a representative from the St. James apartment building management, and the fact that the leasing agent may not have been able to obtain a credit report does not render the lease fraudulent. ROP 118. She maintains that, regardless of the document's validity, it evinces her intent to reside at the St. James apartment with Boughaou. *Id.* Finally, in their affidavits, both Boughadou and

Cassell state that they never intended to deceive USCIS at their April 20, 2005 interview regarding Boughadou's purchase of the South State Street condo. ROP 198. Boughadou said that he remained silent on the issue only because the USCIS officer did not inquire about it. ROP 198. And Cassell was not even aware that Boughadou had purchased it at the time; according to Boughadou, he did not tell Cassell about it because their relationship had gone sour at that point and he "had a strong feeling that [their relationship] would not [improve]." ROP 138.

On May 2, 2011, USCIS issued its Decision on Petition for Alien Relative. In its eight-page decision, USCIS detailed its reasons for concluding that Cassell had not met her burden of proving that she and Boughadou intended to establish a life together at the time they were married by a preponderance of the evidence. ROP 64. USCIS noted that, although Cassell claimed to reside at the St. James apartment with Boughadou, "[s]ome of the documentation [that she provided in support of that claim] was weak or incorrect evidence." ROP 65. Specifically, USCIS highlighted the copy of the St. James apartment lease that Cassell originally provided to USCIS, which (upon further investigation) turned out to be invalid because Cassell had refused the prerequisite credit check. ROP 65. USCIS noted that the valid lease for the period in which Cassell and Boughadou were married and not-yet-separated listed only Boughadou as a tenant, which (as USCIS noted) is more consistent with Cassell's representation in her affidavit that she only spent the weekends or (at best) part of the week at Boughadou's apartment. ROP 65. USCIS further noted that the electric and phone bills that Cassell submitted, though addressed to both Cassell and Boughadou, listed only Boughadou as the account holder. ROP 65. USCIS also observed that their joint bank account was only opened two months prior to their separation and consisted of a low balance and very little activity – the few checks that were cashed on the

account were signed only by Boughadou. ROP 65. To USCIS, this evidence fell short of establishing that the couple shared joint financial responsibilities and co-mingled financial resources. ROP 68.

With specific regard to the invalid lease, USCIS noted that "a signed lease means . . . that the parties signing the lease live at the location in question and are jointly responsible for payment of the rent. The lease was never 'valid' in the sense that this shared responsibility never existed during the period for which the lease was signed and was ostensibly responsible. . . . Thus, it was presented as evidence of a commingling of financial resources which did not exist." ROP 68. USCIS went on to say: "it is appropriate to question whether the lease is genuine proof of intent to cohabit at the location, or whether this element of marital union also did not exist. The fact that a misleading document has been presented as evidence naturally raises the question of whether the rest of the evidence presented by the same parties might not also be misleading." ROP 68.

USCIS also concluded that the evidence failed to establish that the couple shared a joint residence, another factor typically considered in determining a couple's intent at the time they were married. Besides the technically-invalid lease and Cassell's admission that she did not permanently reside with Boughadou at the St. James apartment, three different police records obtained from the time period before the couple separated demonstrate that Cassell was using her mother's Berwyn addresses (her mother apparently moved within Berwyn during that time period) as her home address. ROP 66. In Cassell's affidavit, she maintained that her daughter needed to remain in Berwyn – preventing the couple from living together full-time – to continue receiving "special services" at her school there. ROP 65. However, the only documentation that Cassell provided in support of this contention was an "Individualized Education Plan" from the

Chicago Public School that Cassell's daughter attended as of July 21, 2008. ROP 65. Although this documentation reflected the fact that her daughter was receiving some type of special services at her school in Chicago in 2008, the document merely stated that her daughter had made "slow academic progress since first grade," which USCIS found insufficient to support Cassell's claim that her daughter was receiving services during 2004-2005 (the year she was in first grade) such that they could not move in with Boughadou in Chicago. ROP 66-67. USCIS also found Cassell's explanation for why Boughadou could not move to Berwyn (fear of Albert Sanchez) to be an implausible reason that a married couple, in love with each other, would reside in different cities. ROP 66, 68.

From the fact that Boughadou had purchased (or at least taken substantial steps to purchase) the South State Street condo by April 19, 2005 and the fact that he did not tell Cassell about this purchase prior to the couple's first USCIS interview on April 20, 2005, USCIS concluded that the couple likely decided to separate before their interview, yet kept that information from the USCIS officer that conducted the interview. ROP 66, 69. USCIS characterized this as a "willful misrepresentation" that "must be taken into account in evaluating the evidentiary value of the other documents" that Cassell submitted to USCIS. ROP 66. Likewise, prior to the second interview in August 2009, Cassell submitted cell phone bills from 2007 through 2009 to USCIS, addressed to Cassell at Boughadou's South State Street condo. ROP 129. In her response to the amended NOID, Cassell explained that these bills were not submitted to mislead USCIS into thinking that the couple continued to reside together, but were submitted to demonstrate their continued friendship; Boughadou had apparently obtained a cell phone for Cassell due to her poor credit. ROP 120. USCIS concluded that this submission was a continued attempt to deceive USCIS. ROP 66.

Addressing Cassell's argument in her response to the amended NOID that the affidavits alone may provide enough positive evidence to sustain Cassell's burden of proof, USCIS agreed that, as a general rule, positive evidence can overcome negative evidence to clear the preponderance standard, but concluded that there were too many "material doubts" in Cassell's case that Cassell failed to adequately rebut. ROP 70. In the end, USCIS concluded that "[w]hile the total positive evidence [Cassell] presented is not negligible, it does not ultimately outweigh the derogatory evidence," and therefore denied Cassell's I-130 visa petition. ROP 70.

After Cassell timely appealed USCIS's decision, the BIA conducted a *de novo* review of Cassell's petition. ROP 4. Summarizing the key evidence relied on by USCIS – namely, the invalidity of the lease, the insufficient support for the contention that Cassell's daughter required special services that prevented them from moving in with Boughadou, the evidence suggesting that the couple intended to separate prior to their first interview (and their failure to divulge this fact at the interview), the bills submitted to USCIS for accounts listed only in Boughadou's name, and the brief period of time prior to the couple's first interview in which their joint bank account was open – the BIA concluded that "while [Cassell] submitted some evidence of the bona fides of her marriage, there was no substantial documentary support of a joint life together with [Boughadou]." ROP 5. The BIA concluded that USCIS properly applied the burden of proof and agreed with USCIS's conclusion that the evidence submitted failed to demonstrate "the bona fides of [Cassell's] relationship with [Boughadou]" and that "the lack of evidence preclude[d] [Cassell] from meeting her burden of proof." ROP 5.

On December 7, 2012, Cassell and Boughadou filed the complaint in this case, arguing that USCIS's and the BIA's denial of Cassell's petition was arbitrary and capricious, not supported by substantial evidence, and otherwise contrary to law. Specifically, they claim that

USCIS and the BIA "arbitrarily ignored probative evidence" and based their decisions on "immaterial considerations" and on evidence that is not in the record (specifically, the landlord's statements that the St. James apartment lease was invalid). According to Plaintiffs, the decisions were based on "mere suspicion of fraud rather than on substantial and probative evidence of fraud," which Plaintiffs argue is required. In Defendants' summary judgment motion, they argue that the record supports the BIA's decision as a matter of law. In Plaintiff's cross-motion for summary judgment, Cassell and Boughadou expound upon the arguments in their complaint and ask that the Court reverse the BIA's decision and, rather than remand the case, order Defendants to grant Cassell's I-130 petition.

## II.    Summary Judgment Standard

This case involves a challenge to a final agency action under the Administrative Procedure Act ("APA") that the parties agree involves judicial review of the Certified Administration Record of Proceedings ("ROP"). See [11]. "Judicial review of an agency's final determination follows standards quite different from those applied in a typical summary judgment proceeding." *J.N. Moser Trucking, Inc. v. U.S. Dept. of Labor*, 306 F. Supp. 2d 774, 781 (N.D. Ill. 2004). 5 U.S.C. § 706 "sets out the standards that courts must follow when reviewing federal agency action unless another statute clearly requires otherwise." *Id.* (citing *Dickinson v. Zurko*, 527 U.S. 150, 154-55 (1999)). When reviewing an agency action under the APA, the Court's review is limited to the administrative record on which the agency based its decision. See 5 U.S.C. § 706; *Little Co. of Mary Hosp. v. Sebelius*, 587 F.3d 849, 856 (7th Cir. 2009).

Relevant here, Section 706 instructs that: "[t]he reviewing court shall: . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a). To determine whether an agency's decision was arbitrary and capricious, district courts must decide whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Indiana Forest Alliance, Inc. v. U.S. Forest Service*, 325 F.3d 851, 859 (7th Cir. 2003) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)). In cases where the court is asked to set aside an agency action on the ground that it was arbitrary and capricious, the "standard of review, established by the Administrative Procedure Act, is a narrow, highly deferential one." *Bagdonas v. Dept. of Treasury*, 93 F.3d 422, 425 (7th Cir. 1996). "[A]lthough the Court is to uphold a decision of less than ideal clarity if the agency's path may be reasonably discerned, it may not supply a reasoned basis for the agency's action that the agency itself has not given." *Id.* at 426. "The district court must consider the agency action valid as long as it appears from the administrative record that the decision was supported by a rational basis." *Id.* at 425-26 (internal citation omitted). "[T]he scope of review . . . is narrow and the court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. "It's not enough that [the court] might have reached a different conclusion; so long as a reasonable mind could find adequate support for the decision, it must stand." *Ogbolumani v. Napolitano*, 557 F.3d 729, 733 (7th Cir. 2009). "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

## III. Discussion

Plaintiffs[1] make three arguments in support of their contention that the decisions of USCIS and the BIA were arbitrary and capricious. First, they argue that the agencies employed the wrong standard of proof in arriving at their conclusion, erroneously requiring Cassell to prove a bona fide marriage by either clear and convincing evidence or beyond a reasonable doubt rather than by a preponderance of the evidence. Second, they argue that the agencies' suspicions of fraud unfairly influenced their evaluation of the evidence; Plaintiffs contend that to deny a petition on the basis of fraud, the agencies must support their conclusion with substantial and probative evidence. Finally, they argue that by considering the landlord's statement that the joint lease was invalid, the agencies improperly relied on evidence that does not exist in the record.

### A. Burden of Proof

The parties agree that for Cassell to obtain approval of her I-130 petition, she had to prove by a preponderance of the evidence that she and Boughadou married because they intended to share a life together at the time they were married. See *of Brantigan*, 11 I. & N 493 (BIA 1966); *Matter of Soriano*, 19 I. & N 764, 765 (BIA 1988); *Matter of Soo Hoo*, 11 I. & N 151, 152 (BIA 1965). The parties also agree that Cassell's and Boughadou's conduct after marriage is relevant to the question of their intentions at the time they were married, and that separation or divorce – by itself – is not enough to support a finding that a marriage was not bona

---

[1] As a threshold matter, the Court rejects the Government's argument that Boughadou does not have standing to challenge the denial of Cassell's I-130 petition. "5 U.S.C. § 702 gives any person 'suffering legal wrong because of agency action, or adversely affected or aggrieved by an agency action within the meaning of a relevant statute' the right to seek federal court review of the agency action." *Ghaly v. I.N.S.*, 48 F.3d 1426, 1434 n.6 (7th Cir. 1995); see also *Hafeez v. Dorochoff*, 2007 WL 4300582 at *1 n.1 (N.D. Ill. Nov. 30, 2007) (citing *Lujan v. Defenders of Wildlife*, 504 U.. 555, 560-61 (1992), which held that a plaintiff has Article III standing if he has suffered an actual injury that is traceable to the challenged conduct and is likely to be redressed by a decision in his favor). Boughadou's immigration status is implicated by the agencies' denial of Cassell's petition, and thus he has standing to challenge USCIS's and the BIA's decisions in federal court.

fide when it was entered.  See *Matter of McKee*, 17 I. & N 332, 333 (BIA 1980).  "Of course, the time and extent of separation, combined with other facts and circumstances, can and have adequately supported the conclusion that a marriage was not bona fide."  *Id.*

Plaintiffs argue that, although USCIS and the BIA decisions specifically cite and purport to apply the preponderance standard to Cassell's petition, the result – in the face of the evidence presented – compels the conclusion that both agencies actually held Cassell to a much higher burden of proof.  In effect, Plaintiffs ask the Court to reexamine the evidence in the record, make its own determination that Cassell proved a bona fide marriage by a preponderance of the evidence, and back into the conclusion that USCIS and the BIA must have applied a higher burden of proof to Cassell's petition.  But in reviewing whether the decision of USCIS or the BIA was arbitrary and capricious, the "Court is not empowered to substitute its judgment for that of the agency."  *Bowman v. Transp., Inc. v. Arkansas-Best Freigh Sys., Inc.*, 419 U.S. 281, 285 (1974).  Instead, the Court's task is to ensure that the agencies weighed the evidence, arrived at a rational conclusion in light of the applicable burden of proof, and articulated its reasoning.

Here, both USCIS and the BIA explicitly noted that they were employing the preponderance standard.  USCIS identified what it considered to be the most compelling documents in the case.  Over the course of six single-spaced pages, USCIS analyzed the evidence (or lack thereof) and provided rationales for its conclusions.  Ultimately, USCIS concluded (and the BIA affirmed) that there was too little documentation of cohabitation and shared financial responsibility, coupled with too much implausibility in (and a lack of documentary corroboration for) the couple's explanations to conclude that Cassell met her burden by a preponderance of the evidence.  In other words, there was simply too much

"material doubt[]" and "that doubt [led] [USCIS] to believe [Cassell's] claim [was] probably not true."  ROP 70.

In her response to the amended NOID, Cassell listed the various documents that typically are considered in determining whether a petitioner has met her burden of proving the couple's intent to establish a life together at the time of marriage.  ROP 182 at n.1.  These include documentation showing joint ownership of property, a lease showing joint tenancy of a common residence, documentation showing commingling of financial resources, birth certificates of children born to the petitioner and beneficiary, and affidavits of third parties having knowledge of the bona fides of the martial relationship.  ROP 181; see also 8 C.F.R. § 204.2(a)(1)(iii)(B)..  These are precisely the types of documents that USCIS and the BIA expected and (where submitted) scrutinized in arriving at their decisions.

Plaintiffs complain that the agencies "disregarded" much of this evidence, which – in light of the agencies' explicit consideration of them – seems to be a complaint about the weight that the agencies attached to the evidence, rather than a complaint that the evidence was not considered at all.  For example, Plaintiffs argue that the BIA "disregarded most of the utility bills Ms. Cassell and Mr. Boughadou provided because the accounts were in Mr. Boughadou's name but not Ms. Cassell's.  And it disregarded their joint bank account because it was only for only a short time."  Pl. Cross-Mot. SJ [23], at 6.  Implicit in Plaintiffs' argument is the contention that USCIS and the BIA were not free to find certain pieces of evidence more compelling than others or weigh favorable evidence against unfavorable (or contradictory) evidence in determining whether Cassell had met her burden.  But that is precisely the job of the agencies in determining whether a petitioner has put forth enough evidence to be entitled to the immigration relief or benefits sought.

Similarly, Plaintiffs take issue with the agencies' treatment of the affidavits that Cassell provided, arguing that "[t]hey were treated as a lesser form of evidence," (Pl. Cross-Mot. SJ [23], at 4), and given little weight because they were from interested parties. *Id.* at 5. But again, there is nothing arbitrary or capricious in giving certain types of evidence more weight than others. These third-party affidavits were from Cassell's mother (who admitted that she did not interact with Boughadou much, because she "lived very far from [him] and [she] did not have a car) (ROP 202), Boughadou's parents (who lived in Algeria, never met Cassell, and mostly described phone conversations they had had with their son regarding Cassell) (ROP 205-06, 211-13) and several of Boughadou's friends who, based on limited interaction with the couple, declared their respective beliefs that Cassell and Boughadou married for love and not to evade immigration laws. See ROP 161-65 (including an affidavit from Boughadou's friend from Houston, Texas who "got to go out to dinners and/or attend cultural events" with the couple when he visited Chicago and, observed that "[t]he relationship between Rafik and Andrea appeared to be based on mutual respect and care between the two"). USCIS specifically acknowledged that positive affidavit evidence can sustain a petitioner's burden of proof, even in the face of negative evidence. ROP 70. However, USCIS and the BIA determined that the affidavits provided in this particular case were not enough to overcome the numerous pieces of evidence that cut against Cassell's claim of a bona fide marriage. ROP 5, 70.

Plaintiffs also complain that USCIS and the BIA failed to "explain that the affiants were untruthful or not credible." Pl. Cross-Mot. SJ [23], at 5. But the Seventh Circuit has made clear that the agencies were not required to do so. Even if "USCIS [and the BIA] could have fleshed out why it found each piece of . . . evidence unpersuasive . . . [the Seventh Circuit has] never required the agency to 'write an exegesis on every contention raised." See *Ogbolumani v.*

*Napolitano*, 557 F.3d 729, 734-35 (7th Cir. 2009) (quoting *Rashiah v. Ashcroft*, 388 F.3d 1126, 1130 (7th Cir. 2004)). Instead, "USCIS [and the BIA] need only 'announce [their] decision[s] in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Ogbolumani*, 557 F.3d at 735 (quoting *Rashiah*, 388 F.3d at 1130-31). The Court is convinced that the BIA has done that here.

In the end, Plaintiffs arguments fall far short of convincing the Court that either USCIS or the BIA applied an elevated burden of proof, but merely reflect Plaintiffs' disagreement and disappointment with the agencies' evaluation of the evidence.

**B.     Evidence of Fraud**

Plaintiffs contend that "defendants in this case staged a tactical retreat between their first NOID and their amended NOID and denial," initially concluding that Cassell "entered into a sham marriage for the purpose of evading the immigration laws of the United States" but ultimately backing away from that accusation and finding merely that Cassell failed to meet her burden of establishing a bona fide marriage. Pl. Cross-Mot. SJ [23], at 5. Plaintiffs argue that, because the government suspected that Cassell and Boughadou entered into a sham marriage, it was required to support its suspicion with "substantial and probative evidence" before it could deny Cassell's petition on that basis. Plaintiffs, however, both misstate the basis for the agencies' denial of Cassell's petition and misapprehend the applicable law regarding fraudulent marriages. Section 204(c) of the Immigration and Nationality Act, titled "Limitation on orphan petitions approved for single petitioner; prohibition against approval in cases of marriages entered into in order to evade immigration laws; restriction on future entry of aliens involved with marriage fraud," states that petitions, like Cassell's, seeking immigration status adjustments for spouses shall not be approved if:

(1) the alien has previously been accorded, or has sought to be accorded, an immediate relative or preference status as the spouse of a citizen of the United States or the spouse of an alien lawfully admitted for permanent residence, by reason of a marriage determined by the Attorney General to have been entered into for the purpose of evading the immigration laws, or

(2) the Attorney General has determined that the alien has attempted or conspired to enter into a marriage for the purpose of evading the immigration laws.

8 U.S.C. § 1154(c). 8 C.F.R. § 204.2(a)(1)(ii), titled "Fraudulent marriage prohibition," reads:

Section 204(c) of the Act prohibits the approval of a visa petition filed on behalf of an alien who has attempted or conspired to enter into a marriage for the purpose of evading the immigration laws. The director will deny a petition for immigrant visa classification filed on behalf of any alien for whom there is substantial and probative evidence of such an attempt or conspiracy, regardless of whether that alien received a benefit through the attempt or conspiracy. Although it is not necessary that the alien have been convicted of, or even prosecuted for, the attempt or conspiracy, the evidence of the attempt or conspiracy must be contained in the alien's file.

8 C.F.R. § 204.2(a)(1)(ii). In other words, if USCIS and/or the BIA conclude that there is "substantial and probative" evidence that a marriage was entered into for the purpose of evading the immigration laws, the agency must deny the petition on that basis. And a denial on that basis will have severe and lasting consequences going forward if one of the parties to the marriage marries again and files a subsequent petition. See *Eid v. Thompson*, 740 F.3d 118, 124 (3d Cir. 2014) (noting that when the BIA supports a determination that an alien sought immediate relative status on the basis of a marriage entered into solely to obtain immigration benefits with substantial and probative evidence, 8 U.S.C. § 1154(c) serves as a statutory bar against subsequent petitions, including those made stemming from bona fide marriages); see also *Zemeka v. Holder*, 2013 WL 6085633 at *2 (D.D.C. Nov. 20, 2013) (noting that 8 U.S.C. § 1154 "prohibits approval of any I-130 petition filed on behalf of an alien beneficiary who has previously been accorded, or has sought to be accorded, immediate-relative status on the basis of a fraudulent marriage," even where the subsequent marriage appears bona fide).

Contrary to Plaintiffs' suggestion, 8 C.F.R. § 204.2(a)(1)(ii) only requires an agency to support a fraudulent marriage determination with substantial and probative evidence if the agency denies the I-130 petition on that basis. That determination is separate and distinct from the agencies' determination regarding whether the petitioner has sustained his/her burden or establishing a bona fide marriage. In *Brown v. Napolitano*, the Fifth Circuit reviewed a district court's grant of summary judgment in favor of the government on appeal from USCIS's denial of the plaintiff's I-130 petition. 391 Fed. Appx. 346 (5th Cir. 2010). The district court found that substantial evidence supported USCIS's conclusions (and the BIA's affirmance without an opinion) that (1) the petitioners failed to prove a bona fide marriage by a preponderance of the evidence, and (2) the Government succeeded in proving that, "*in the alternative*" (*id.* at 347 (emphasis added)), petitioners "had entered into their marriage solely to obtain an immigration benefit for [the alien petitioner], rendering it a "sham" marriage." *Id.* at 349. In affirming the district court's grant of summary judgment, the Fifth Circuit explained that the petitioners had the burden "to show, by a preponderance of the evidence, that 'they intended to establish a life together at the time of their marriage." *Id.* at 350 (quoting *Matter of Pazandeh*, 19 I & N Dec. 884, 887 (BIA 1989)). But as to USCIS's alternative basis for denying the petition, the Government had the burden of showing "by substantial and probative evidence" that petitioner's marriage was a sham from its inception. *Id.* at 351. As the Fifth Circuit made clear, these are separate and alternative grounds for denying the I-130 petition. *Id.* at 349.

In Cassell's and Boughadou's case, USCIS did not conclude that their marriage was fraudulent. The Government did initially accuse Cassell and Boughadou of having a sham marriage in the NOID after their second interview – where USCIS learned, among other things, that the couple separated just weeks after their first interview and that Cassell had since had two

children (and lived) with another man, despite remaining married to Boughadou.  See ROP 324 ("Your actions show that you were a willing participant in any attempt by your spouse to defraud the United States Government.").  But after giving Cassell an opportunity to rebut that accusation – in response to which she submitted a joint automobile insurance policy, life insurance policies for both Cassell and Boughadou naming the other as a beneficiary, and affidavits from family and friends – the Government backed away from that position in its amended NOID.  See ROP 133 (noting that the affidavits "constitute positive, but not overwhelming, corroborative evidence for the bona fides of your marriage" but that "there are significant inconsistencies in the record which affect the credibility of the statements and evidence [Cassell] presented.").  Ultimately, the Government did not prove (and USCIS did not conclude) that Cassell and Boughadou entered into a sham marriage.  Instead, USCIS determined that "the total positive evidence [Cassell] presented . . . [did] not ultimately outweigh the derogatory evidence" and that  Cassell "failed to meet [her] burden of proving that [her] marriage was bona fide from its inception."  ROP. 70.

In other words, the Government had no burden of proof because USCIS did not deny Cassell's petition on the basis of a sham marriage.  USCIS concluded that certain documents (such as the invalid lease) were misleading, and USCIS took that into consideration when making credibility findings, but that did not shift the burden from Cassell to the Government.  At all times, Cassell had the burden to prove a bona fide marriage by a preponderance of the evidence, and USCIS denied  her petition after concluding that she failed in that regard.

### C.    Evidence Not in the Record

Plaintiffs argue that they were unfairly prejudiced by USCIS and the BIA's reliance on Boughadou's landlord's statement that the lease that Cassell signed was invalid.  Plaintiffs cite to three BIA cases from the 1970s and an opinion from the Northern District of California for the

unremarkable proposition that Cassell had a right to review and rebut the evidence relied on by the agencies. They argue that the landlord's statement to a USCIS investigator was never "substantiated" because "[t]here are no notes of the conversation by the USCIS officer involved that are dated contemporaneously with the time it occurred." Pl. Reply Br. Cross-Mot. SJ, at 2. But the only Seventh Circuit case on this point demonstrates that there was nothing wrong with USCIS's reliance on the statement.

In *Ogbolumani v. Napolitano*, the plaintiffs made a similar argument, challenging the fact that "USCIS relied not on sworn statements by [petitioner's sister-in-law who claimed that the petitioner's first marriage was a sham], but [on] summaries of what [she] had said, written by USCIS investigators." 557 F.3d 729, 734 (7th Cir. 2009). The Seventh Circuit, however, rejected the plaintiffs' argument, noting that "while sworn statements would have bolstered USCIS's case, they are not, as [plaintiffs] argue, required." The Court described "[the plaintiffs] dissatisfaction with the summaries [as] a hearsay objection of sorts – in essence [plaintiffs] argue that, to ensure the reliability of such damaging evidence, the statements must come straight from the horse's mouth. But even in removal proceedings, hearsay is admissible so long as it's probative and its use is not fundamentally unfair." *Id*. Because the plaintiffs "point[ed] to nothing that suggest[ed] that the summaries [were] inaccurate or unreliable beyond the general 'inherent risks' that come with using a synopsis and suspicions, ungrounded in the record, that [the witness who made the statement] lied out of spite," the Seventh Circuit determined that there was not enough to call the USCIS investigator's report containing the statement into question. *Id.*

Here, as in *Ogbolumani*, Boughadou's landlord's statement is contained in a USCIS investigator's report. ROP 37. Specifically, investigator Sean O'Reilly wrote: "Boughadou and

Cassell submitted a lease agreement (dated September 8, 2004) for [the St. James apartment]. The said lease contained signatures for Boughadou and Cassell. USCIS called the real estate management company to verify the authenticity of said lease. The management company informed USCIS that the said lease (dated September 8, 2004) was NOT valid because Cassell refused the management company's prerequisite 'credit check.' The management company informed USCIS that only Boughadou's name appears on the lease for the time period in question." *Id.* Although, as the Seventh Circuit recognized, such a statement imposes "inherent risks," those concerns speak to the weight of the evidence, not to the admissibility of the statement. USCIS was free to consider the investigator's summary along with all of the other evidence before it.

The Court rejects Plaintiffs' argument that without better documentation (such as a sworn statement from the management company) they were prevented from rebutting this statement in violation of 8 C.F.R. § 103.2(b)(16), which states that "[i]f the decision will be adverse to the . . . petitioner and is based on derogatory information . . . of which the petitioner is unaware, he/she shall be advised of this fact and offered an opportunity to rebut the information and present information in his/her own behalf before the decision is rendered." Plaintiffs were offered two opportunities to rebut this statement, in response to both the NOID and amended NOID, yet failed to do so. Regardless of whether the statement was contained in a USCIS officer's summary or in a stand-alone declaration, Plaintiffs could have rebutted the evidence in the same way. If the lease truly was valid and the management company was mistaken in reporting to USCIS that Cassell refused a credit check, Cassell could have obtained a statement of her own from the management company, rebutting the investigator's summary. Nothing prevented her from doing that. Instead, Cassell's only attempt to rebut the statement was to include a line in

her affidavit that read: "I do not know why the management company might now say the lease I signed was invalid." (ROP 135). USCIS considered this affidavit, but found it to be insufficient to rebut the landlord's statement. (ROP 68).

In Plaintiffs' Citation of Supplemental Authority [28], they argue that *Pouhova v. Holder*, 726 F.3d 1007 (7th Cir. 2013), compels the Court to remand Cassell's petition on this basis. In *Pouhova*, the plaintiff entered the United States on a student visa, married a U.S. citizen, and applied for an adjustment of status. 726 F.3d at 1009. Instead of granting her petition, however, the Government initiated removal proceedings to determine whether Pouhova should be removed from the United States for assisting an alien trying to enter the country illegally. *Id.* At her removal hearing, the Government presented just two pieces of evidence in support of the charge, both reports by an immigration official at O'Hare Airport who had prevented a woman named Boriana Dimova from entering the country with Pouhova's Bulgarian passport. *Id.* According to the reports, Dimova told the immigration official at O'Hare (without a translator) that Pouhova had given her the passport to try to enter the United States in exchange for $1,500. *Id.* At her hearing, Pouhova denied knowing Dimova and testified that she had lost her passport years earlier. *Id.* at 1010. But the immigration judge credited the Government's documents and found that the Government had proven that Pouhova assisted in smuggling an alien into the United States, rendering Pouhova subject to removal (even in spite of her marriage to a U.S. citizen). *Id.* at 1010. The BIA affirmed. *Id.* at 1011. Reviewing the decision, the Seventh Circuit concluded that because this was the Government's only evidence and because Pouhova had no ability to examine Dimova (who had been removed to Bulgaria) or the immigration officer who took the statement at the hearing, she was deprived of her procedural rights and this violation prejudiced her. *Id.* at 1011-12.

Cassell's case is distinguishable from *Pouhova* in several material ways. First, Pouhova had no meaningful way to rebut the Government's report, because Dimova had been deported to Bulgaria. Here, as discussed, Cassell was not deprived of an opportunity to rebut the evidence in any meaningful way. Second, the reports in *Pouhova* were the Government's *only* evidence and served as the sole basis for the immigration judge's decision that Pouhova assisted in smuggling an alien into the United States. In Cassell's case, the landlord's statement was one of many pieces of evidence that USCIS weighed in determining whether Cassell met her burden of proof. Finally, in Pouhova's case, the report was direct evidence of the violation. By contrast, Cassell and Boughadou admitted that Cassell lived in Berwyn and only stayed at the St. James apartment on a limited basis, so the invalidity of the lease did not fundamentally alter the totality of the evidence concerning the couple's cohabitation.

For these reasons, Cassell's case better fits the mold of *Ogbolumani*, in which the Seventh Circuit determined that USCIS's reliance in denying an I-130 petition on an investigator's summary of a witness's statement was not "fundamentally unfair." 557 F.3d at 734.

### D.    Arbitrary and Capricious

In the end, all of Plaintiffs' arguments – that USCIS must have employed the wrong burden of proof in arriving its decision, that the Government did not prove that the marriage was a sham, and that USCIS assigned too much weight to a statement by Boughadou's landlord – are, at bottom, gripes about the ultimate result that USCIS reached. But under the arbitrary and capricious standard, the Court's task is to ensure that USCIS and the BIA "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Indiana Forest Alliance, Inc. v. U.S.*

*Forest Service*, 325 F.3d 851, 859 (7th Cir. 2003) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)). Under this highly deferential standard, "so long as a reasonable mind could find adequate support for the decision, it must stand." *Ogbolumani v. Napolitano*, 557 F.3d 729, 733 (7th Cir. 2009). Having examined the evidence in the record, the Court concludes that a rational connection exists between the facts found by USCIS and its denial of Cassell's petition. As USCIS recognized, Cassell did put forth some positive evidence of a bona fide marriage (which is presumably why the Government ultimately backed away from its initial accusations of fraud), but in light of the totality of the evidence before the agency, a reasonable decision maker certainly could find adequate support for the agencies' decision to deny Cassell's petition.

Cassell and Boughadou met randomly in a McDonald's in June 2004. They married two months later and Cassell applied to adjust Bougadou's immigration status the next month. ROP 65 (USCIS Decision on Petition for Alien Relative, May 2, 2011). Plaintiffs maintained different residences in different cities and never lived together full-time, even by Plaintiff's own affidavits. ROP 65. Cassell claimed that she and her daughter could not move to Chicago and live with Boughadou because her daughter was receiving "special services" at her school, but Cassell never produced documentation to support that claim. ROP 65, 67. Cassell claimed that Boughadou could not move to Berwyn, Illinois to live with Cassell, because of fear of Cassell's ex-boyfriend (reasoning that USCIS found unpersuasive). ROP 66-68. The couple submitted a joint lease, but after USCIS's investigation revealed that the lease was invalid, USCIS concluded that the document failed to demonstrate joint financial responsibility (since Cassell was not legally bound by the lease). ROP 65, 68. In April 2005, Plaintiffs interviewed with a USCIS officer but separated just weeks later. ROP 66. Moreover, Boughadou had purchased a condo at

the time of the interview that Cassell knew nothing about it (suggesting to USCIS that they already planned to separate) and that Boughadou kept a secret from the interviewing USCIS officer (who only discovered this through post-interview investigation). ROP 66. Cassell and Boughadou remained legally married, but she moved in with another man and had two children with him. Prior to her second interview in 2009, Cassell submitted additional evidence to USCIS in support of her petition, including mail that was addressed to both Cassell and Boughadou at Boughadou's South State Street condo. ROP 68-69. USCIS considered this submission to be an attempt to deceive USCIS into believing that the couple lived together at the condo. ROP 69. Based on this derogatory evidence, USCIS concluded that Cassell's claim to a bona fide marriage was "probably not true" and therefore decided that she had not met her burden of proof by a preponderance of the evidence.

In light of the evidence, the Court cannot say that USCIS did not have a rational basis for its decision. Although the Court found no factually analogous cases in the Seventh Circuit, the Fifth Circuit's decision in *Brown v. Napolitano* lends considerable support to the Court's conclusion here. See 391 Fed. Appx. 346 (5th Cir. 2010). In *Brown*, a couple met in June 2003, were engaged by September, and married in November. *Id.* at 347. They filed an I-130 petition the next month (December) and had their first USCIS interview in July. *Id.* In support of their marriage, the couple produced records from a joint checking account from February 2005 through June 2005 (reflecting just a few transactions a month) and their 2004 joint tax return. *Id.* at 348. They submitted a joint lease, but admitted to only seeing each other every 2-3 weeks. *Id.* They also provided a joint utility bill, joint furniture purchases, photographs, and affidavits from themselves and from family. *Id.* However, USCIS took issue with the facts that the couple did not live together full-time (the woman apparently moved out of their apartment after the death of

her father) and "that there existed little to no evidence that [the couple] had commingled their assets." *Id.* The district court granted summary judgment in favor of the Government, after the plaintiffs appealed USCIS's denial of their petition for failure to prove a bona fide marriage by a preponderance of the evidence. On appeal, the Fifth Circuit noted that "[t]o obtain a reversal of the USCIS's decision, [the plaintiffs] bear the burden of showing that the evidence they presented was so compelling that no reasonable fact-finder could fail to arrive at their conclusion," and affirmed the district court's decision. *Id.* at 350 (internal citation omitted).

In the end, Plaintiffs have not convinced the Court that the decision of either USCIS or the BIA was arbitrary and capricious. The agencies employed the appropriate burden of proof, afforded Cassell multiple opportunities to rebut the derogatory evidence in the record, and ultimately arrived at a decision that – though disappointing to Plaintiffs – was based on a reasonable and rational connection to the facts. Certainly this record does not permit the Court to conclude that USCIS or the BIA "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. Accordingly, the decisions of USCIS and the BIA must stand.

## IV. Conclusion

For the reasons stated above, the Court grants Defendants' motion for summary judgment [17] and denies Plaintiff's cross-motion for summary judgment.

Dated: March 31, 2014

Robert M. Dow, Jr.
United States District Judge